The third case this morning is number 15-1132, the Ohio Willow Wood Company v. Alps South, LLC. Mr. Loken. Thank you, Your Honor. I think I'm going to reserve three minutes of rebuttal time. This case is back before the court following a trial on the inequitable conduct question based on this court's original decision, in this case, reversing the summary judgment. This court found in the first appeal that the district court's judgment that nothing that was withheld from... Why don't you focus on, with respect to the second re-exam, the letters and why the district court's finding of inequitable conduct with respect to the disclosure of the letters wasn't correct. The letters or the declaration... The situation where the second re-exam is initiated specifically relying on the Comcast testimony and the Comfort Zone ad, the examiner finds the patents invalid based on the ad and the Comcast testimony and then you convince the set aside the rejection and determine patentability based on the fact that the Comcast testimony wasn't corroborated. And the argument is that the letters corroborate. I don't suppose you're disputing that, are you? Actually in the second re-exam, yes, Your Honor. The letters, there's a pair of letters and a pair of attachments. The attachments were submitted, one in the first re-exam, one in the second re-exam. So the issue becomes what the cover letter said. The second re-exam, as Your Honor noted, was about the SSGL Comfort Zone ad. And the competitor that's at issue here, Silo Sheath, made two separate lines of product. There's still a post, I'm sorry. Two separate lines of products. There's the Silo Sheath, which was the subject of the first re-exam. The letters both made it perfectly clear that the letter and the attachment were about the Silo Sheath, not the SSGL. So that the application that was attached and closed with the First Amendment, or with the first letter, and the application, the abandoned application, was of record. All that providing the letter in addition would have done is make it even more clear that it not only wasn't but-for material, it wasn't even material, because the application in the letter referred to the Silo Sheath that was in the first re-exam. Why isn't it fair to... Well, I'm sorry, I cut you off. I was going to say, Your Honor, I'm probably going to end right where you pivoted me. The second re-exam, because the printed publication it issued there was clearly the SSGL, not the publications about the Silo Sheath. So the question of corroboration went to Mr. Comtesse's statements that the SSGL was on sale by the critical date, and evidence about the Silo Sheath was not relevant to that, and I think that was clear in the Board's decision. Why is it not the case that the evidence suggests that the single socket gel liner, the SSGL, is among the product lines for the Silo Sheath line? There's one of the ads, the one at 6246, specifically has the picture of the product, identifies it comfort zone single socket gel liner, and then down towards the bottom it says Silo Sheath product line. It sounds like it's saying that this is one in the Silo Sheath product line. It suggests that the Silo Sheath and the SSGL could be seen as part of the same product line. That's a pretty important point, isn't it? Your Honor, I don't think so. You just said that Silo Sheath and SSGL were clearly distinct. Yes. This suggests the contrary to that. So if it is true that they're not really distinct, and that Silo Sheath is a description of a product line that includes SSGL, then the letters certainly take on more importance. Mr. Comtesse's testimony that is to be corroborated or not is not about, in the second re-exam, is clearly not about the entire Silo Sheath line. Maybe not the entire line, but the question is when he says that in the Silo Sheath line we have products that have gel on only one side. The ad says the SSGL is in the Silo Sheath line. Right. Mr. Comtesse's declaration, which is very thin, but his deposition testimony, which repeats it in more paragraphs, talks not about the entire line. He talks about the SSGL. He doesn't have to talk about the entire line. It doesn't have to be true of the entire line. No, Your Honor. The point is some SSGLs can be read as Silo Sheaths, not all Silo Sheaths are SSGLs. In the second re-exam... On what? You have the letters which talk about the Silo Sheath product line as having this avoidance of bleed through. Then you have Comtesse saying that yes, that's what the comfort zone ad discloses with respect to the SSGL. He doesn't suggest that all four pickup trucks don't have bleed through. That doesn't make any difference whether it's all four. But the ad according to what the petitioner said in the re-exam and according to what the re-examiner found to make this invalidating or rendering non-patentable is that one skilled in the art would have recognized this as a single socket gel liner, that this is an SSGL, not anything else in the Silo Sheath line. Those were dealt with previously. This is an SSGL. That is the basis of the examiner beginning the re-exam. That is the basis of his finding that it wasn't patentable because the SSGL, that specific model, if you will, is the one he is aware and the board is aware that in the prior exam, the Silo Sheaths, the rest of that line, the ones that were made... I'm really not following you. You have Comtesse saying that one product here at least avoids the bleed through. And he talks about that being shown in the Comfort Zone ad. And then you have a letter which says, yes, within this line, we did have, there were products that avoided the bleed through. Why isn't that direct corroboration of what he said? Because they are separate and I apologize that I'm not being clear. The other Silo Sheaths, the core Silo Sheath line, has a fabric of nylon that allows bleed through. And the nylon product is the product that the letters are addressing. That's not true. He talks about the product line. He doesn't talk about one single product. He talks about, I think, the attachment in the first one, the first letter that has the application, makes it clear that it is nylon, not Coolmax, that they're using. And thus that... And he also doesn't talk about the entire Silo Sheath line. He talks about the Silo Sheath in particular. His first letter with the application talks about a particular Silo Sheath product and the application talks about nylon. The critical part of the SSGL model or specific product or SKU, if you will, is that it had Coolmax. So that the nylon Silo Sheaths, which are the ones that were sold under the name Silo Sheath, not SSGL, the nylon Silo Sheaths were the first re-exam. The distinguishing characteristic about the particular SSGL version of these, the SSGL product, even if they call it part of the line, is that it has Coolmax, which is a thicker fabric, and therefore there cannot be bleed-through, and therefore one would take this ad, which purportedly is a picture of an SSGL, not the Silo Sheaths that were in the first case in the first re-exam, and says that is not susceptible to the problems that were discussed that allowed patentability in the first... Okay, but suppose we... I was going to move on if you had another question. Well, I do have another question. And so Mr. Scalise then, what you're saying is Mr. Scalise is mistaken, charitably speaking, into saying that the Silo Sheath items that he's referring to in his letter, the first of the letters, did not have bleed-through. That's, you think that's the way one should read this? That is definitely. He is describing... He's just wrong. He is, my point... to the attention of the PTO as a potential, particularly as potential corroboration of contests. It is clear that he is talking... Yes, he is talking about the original nylon Silo Sheath, not the Coolmax SSGL, which is in the second re-exam. If you had been arguing this case before the board, and you had this in your briefcase, and you knew about it, and you were intending to argue that the contest declaration was wholly uncorroborated, don't you think you would feel an obligation to say, now, of course, there is this letter from Scalise, but we think Scalise is mistaken, and here's why? Your Honor, I may well have a more cautious approach than counsel had in this case, but I don't know that one can say that he omitted a material reference and that he did it with deceptive intent. It's strong to say that this is uncorroborated if you have something in which somebody is saying, whether you believe it or not, it's exactly the contrary of what you're saying is the fact. Your Honor, I've been addressing largely materiality. The record is far from clear that counsel Guyon was aware of the letters. We're talking about Colvin here in light of the findings that are made by the... Well, Colvin was clearly aware of the letters, right? He testified that he was aware of the first. The second, I don't think he was actually asked about, but he was... Remember, these are 1999 letters that are now becoming material or not material. So assuming we reject your argument about the letters being corroborated, and we conclude that they're clearly corroborated, let's just assume that as a hypothetical. What argument do you have to set aside the district court's conclusion of inequitable conduct with respect to the second re-exam and the letters? And the letters. It would parallel the argument we make about the declarations, but it would be even more powerful, Your Honor, because you've got... I mean, this is a litigation in which there are thousands and thousands and thousands of pages that the district court is assuming that Mr. Colvin reads and retains almost like a computer. So you've got... He read the letters. You've got letters that are... Unlike the declarations where he said he didn't read them, he read the letters. So what's the argument? Well, his testimony about the letters was that he was... The second letter went straight from Sillipost to outside counsel, and I don't think the record is at all clear that Mr. Colvin definitely ever saw the second letter. The first letter was sent to his boss, Mr. Arbogast, and I think his testimony was it must... The equivalent, I'm not quoting, was it must have come through me. But it was still a 1999 letter, and we are now... We're through the 2004 original allowance. We're through the 2006 summary judgment motion. We're in the second re-exam, and a non-lawyer is sitting back there. Is he forgotten about the letters? It's not clear. He never got to that. He wasn't asked. But is there was... He was never asked. I don't think the record is clear whether he recalled it. I think the testimony, Your Honor, was that he thinks... He knew he was originally aware of the letter to Mr. Arbogast's boss. I don't think the record is clear one way or another as to whether he remembered it in sufficient detail to know anything about it in 2011, 12 years later during the second re-exam. I want some discussion of the court's finding of inconceivability as to Colvin's knowledge of the 2006 exhibits, because I'm going to ask your opposing counsel about it, and I want you to discuss it. Your Honor, and those... To get to intent or to get to any of the Theracent steps, he has to put it... The district court has to put it in Mr. Colvin's hands. He has to have Mr. Colvin read it. He has to have Mr. Colvin remember it five years later, realize it's material, and then make a decision. The judge says it's inconceivable. And the only thing the judge, that the district court found, was that the protective order did not preclude counsel giving it to him, although it doesn't compel them to. It just doesn't preclude it. And that since he was, in effect, the interface with the company, with the lawyers, that he would have wanted to see everything in the litigation, and therefore he would have seen this. But they filed all of this under seal in a multi-volume thing that was about that thick. I'm aware of the record. I'm sorry, Your Honor? I'm aware of the record. Yes, and there is no testimony, regardless of whether the court disbelieved both Mr. Colvin, who was only reciting what he had been told the protective order said. He was not purporting to recite it because he never read it. And the court disbelieves both of his counsel about what the protective order did or did not permit them to do. Like the court's decisions in Starr Scientific and the other cases, that doesn't lead to an inference the other way or permitting an inference the other way without more proof that counsel actually did split this thing up and determine what they could provide to him and what they didn't. And as a matter of fact, it is entirely reasonable, I submit, for counsel to be a little trepidatious or whatever the right adjective would be about doing, approach it with trepidation to do that. Because in 2012, a year after these events, when these very 2006- What's the impact if we believe that the district court erred as to his finding of actual knowledge on the part of Mr. Colvin as to that 2006 material, but we take the letters as material and he said he knew about them? Well, Your Honor, then I have to go back and address those letters because I understand that the district court found on the basis of the letters and the declarations. And the declarations- How is there enough to sustain the judgment? That's my question. If the court found that they were in fact but for material and the court found that Mr. Colvin, despite any finding of record, that Mr. Colvin remembered them in such specificity and that Mr. Colvin, a non-lawyer, understood that they were material and the materiality that the court- It gets pretty subtle here. That's enough to sustain the judgment. Well, and that he decided with specific intent to deceive. That's enough to sustain the judgment. Well, if we get all the steps of Therosensor met, Your Honor, yes, it sustains. I believe it would. But here, it's not- I'll start backwards with the ultimate intent to deceive. These documents were in their summary judgment motion. If he knows all these things- It sounds to me as though you're saying that absent a confession- No. By the party's representative, that you can't show an equitable- No, Your Honor. And I would suggest the Courts of Venice decision is the classic case of what kind of evidence you actually need. I mean, that's one where the defendant denied receiving it and said, I got the later version of it. And in fact, they did find not a confession- I acknowledge you're not going to get a confession. But in discovery, they did find that the defendant had received the earlier version because he approved it for publication. He also denied knowledge of materiality of a reference because he said, well, that reference talks about certain tests. And when we did the test, they failed. And there was extrinsic evidence that some of the tests had passed. So his basis for saying, I didn't get that, or I didn't remember it, or I didn't understand it, was baseless. It wasn't baseless. It was credible. It just wasn't permissible. It wasn't the single most reasonable inference. And it didn't permit an inference of deceptive intent. It wasn't enough to assume the opposite once you've discredited his testimony. And here, Mr. Colvin repeatedly explained his understanding- just disbelieving his testimony because he also admitted that he was primarily responsible for supervising litigation. Well, Your Honor, I compare it to the Starr Scientific decision when you're talking about the people who are responsible for firing counsel. They clearly had authority to do it. So they were motivated to know what was going on, too. I mean, he was the interface. But he's not a lawyer. They're brief talking about all the litigation. This isn't the only case that was going on. We're on the other side of a number of cases that have that they're bringing. Mr. Colvin, in his part-time side job, is basically handling interface with the lawyers. But the materiality issue here, from his knowledge of materiality, his understanding of materiality in a re-exam is a printed publication. And it's pretty nuanced to the lawyers as to how when his lawyer stands up and starts talking about contests, that puts on sale information that contests has said or that might corroborate contests that would normally be outside of a re-exam. I mean, we're down into it. We're well over time. So I apologize. We'll give you three minutes for a rebuttal here. Mr. Cristaldi? Yes, sir. May I please report? My name is Ron Cristaldi. I'm an attorney with the law firm of Shoemaker, Lupin, Kendrick, and have the pleasure of representing the defendant cross-appellant Alps South LLC. Your Honor, I'm here today as an officer of the court, not just to represent my clients, but also because I have myself lived these cases for 11 years and feel that the pattern of activity that Ohio Willwood has engaged in during the course of these cases without full rebuke runs the risk of degrading the integrity of both the patent system and- No, we're probably not going to be able to rescue the integrity of the patent system or further degrade it by any single decision in this case. Why don't you get to the nitty-gritty here? Yes, sir, Your Honor. First question is the one that Judge Wallach raised. I'm interested in hearing your response as to why it is that given the fact that Mr. Colvin does not acknowledge and there's no other direct evidence of his knowledge of the 2006 SSGL exhibits, why it is that that part of the district court's judgment is not reversible? Yes, Your Honor. This is from the record. It's Mr. Colvin's testimony. It's at JA012375. The questions asked to Mr. Colvin, for instance, were you responsible for all intellectual property matters at Ohio Willwood? Answer, yes. Were you responsible for overseeing patent prosecutions? Yes. Were you responsible for the Kanye patents? All the patents, this family of patents that sued Kanye being the inventor. His response was, I was responsible for overseeing them. Yes. Question, were you responsible for supervising all intellectual property litigation at Ohio Willwood? The response was yes. Were you responsible for the reexamination proceedings involving Ohio Willwood and its patents? The answer was, I was responsible for overseeing them. Mr. Colvin is not a person who, as the briefing indicates, is just an engineer who happened to be answering a question or two. No, but he testified that he was not, he did not sign the protective order, that the appendix in which this material appeared was sealed in the court proceedings. And there was other testimony that the appendix was never broken up so that the protected material was never segregated from the material that was not designated for attorney size only. Testimony, both of his testimony and that of Mr. Speed, I think it was, was that he never saw it. And the standard is actual knowledge, and yet the trial court uses a standard of inconceivability. Yes, sir, your honor. Clearly, the trial court's irritated. Yes, your honor. I think one very important point is the two Scalise letters were items that were produced by Ohio Willwood. And we're not talking about the Scalise letters right now. We're talking about the 2006 SSGL exhibits, right? These are the Scalise letters weren't in the, they weren't at least exclusively in the summary judgment attachments. These declarations were in the summary judgment attachments, which were sealed. Now, why, how can we get from the evidence we have to support the district court's conclusion that Mr. Colvin has to be disbelieved, and instead we have to substitute a finding that there was knowledge on Mr. Colvin's part of those exhibits? Yes, your honors. I think the district court inferred that from the, all of the circumstantial evidence of the extensive involvement Mr. Colvin had, not only in this litigation and other litigations. For instance, one of the declarants was a prosthetist named Mr. McElhinney, Jim McElhinney. There was an inventorship hearing in the 688 case that was, I believe, a four or five day full evidentiary hearing. Mr. Colvin sat through that entire hearing. Mr. Colvin was extremely involved in all aspects of this litigation. This was the most important patent. It is by far the single largest product for Ohio Willowood. The testimony is that during the pendency of this case, they made over 200 million dollars selling this product. Was there any testimony that he reviewed other pleadings in the district court litigation? I believe there was, your honor. So for instance, he testified, and I can, the citation in the record is to JA12448. I said it's not that good on this little print. I'm sorry. JA12448-55 where Mr. Colvin testified that he reviewed the Scalise letters and he testified that as part of the first examination. He reviewed them and they considered whether they should. Yeah, but he didn't testify he reviewed them as part of the litigation. And the point is that where he does say he reviewed it, the court has a basis for its determination. But he says he did not review the 2006 exhibits. And yet the court simply says, well, that's inconceivable. Again, I believe that given the totality of the evidence of his pervasive oversight and participation, he was the sole person at Ohio Willwood who was managing. What I was asking you, is there any testimony that he routinely reviewed pleadings in the district court litigation? I don't believe that he, there is testimony that he routinely reviewed pleadings, Your Honor. For, I believe that for Mr. Gyan to be going in arguing a lack of evidence and the fact that he would have not asked his own client, is there any other evidence out there? And the only person he would have asked the client is Mr. Colvin. That question, it is inconceivable that a lawyer would go before a tribunal and make the assertion that no evidence exists without simply asking the question that a client, is there any other evidence? Are you aware of this? Is this correct? I'm going to go represent to the court and Mr., you know, make no mistake that Mr. Gyan's representations were very strong. This is a quote that appears at JA009053, quote, and this is before the Board of Patent Appeals. There is not a single piece of documentary evidence that shows a single socket gel liner in Coolmax. He continues to argue, quote, that's literally all they have in referring to the ad and the argument. It was inconceivable, I believe, for the district court that a lawyer would go before a tribunal and make such a strong argument about a void, a lack of evidence without simply asking his client, is there anything else out there? Without asking his co-counsel who has been litigating the case for eight or nine years, I'm going to go represent to the tribunal that there's nothing out there. And I think that the court found that Mr. Colvin's pervasive involvement in this litigation, Mr. Colvin knew, and the record testified that he had a favorable impression of Mr. Gailey and Mr. McElhinney. He knew them. He knew them personally. Let me move you to the first re-exam because that's part of your cross-appeal argument here. Are you arguing that there was a misrepresentation in the course of the first re-exam or just a lack of candor for failing to disclose things? It was a very affirmative misrepresentation. What was the misrepresentation? It starts with the premise that the issue in these cases, despite argument of counsel about the specific... No, specific statement. What specific statement was a misrepresentation? Sure, Your Honor. The specific statement when they went into the interview and the interview was attended by Mr. Guyon and Mr. Stanley were counsel for Ohio Willwood, Mr. Colvin, the inventor, Mr. Kania and three examiners. And they specifically argued in the summary of argument in this case, it chronicles that that there was no prior art with gel on only one side of the fabric. This was an argument that they made pervasively throughout these cases. And they made... Where do we find this? Yes, sir. If you bear with me just one second, Your Honor. Your Honor, I apologize. I don't have that specific citation, but what I will tell the court is that it is in the summary of argument filed by Mr. Guyon immediately preceding the July 17, 2007 interview. I apologize. They don't have the reference. The reference to prior art there where we aren't talking about the question of corroboration, which was the issue in the second re-examination was a reference to prior art as that term is used in the context of re-examinations, which would be either prior patents or printed publications, right? So something like the Scalise letters wouldn't be prior art. That's a mis... Prior products wouldn't be prior art. I believe that's a mischaracterization. I'm sorry, Your Honor. I'm sorry. Go ahead. I believe that's a mischaracterization in the briefing of the opposing counsel that it may have been a misunderstanding of Judge Frost. In a re-examination proceeding, in order to determine whether there's a substantial new question of patentability and in order to determine initial rejections, you can only rely on publications of prior art. What the rule says, and I believe it's 1555, 37 CFR 1555. I can tell you in just a minute, but to finish my argumentation, Your Honor, what the rule says is that once a claim is rejected or amended, then 112 happens and it's open to a re-examination in the normal process you would have in a typical examination. So if you were to amend a claim in a re-examination, it makes sense that the amendments, the new language is not based on just what the prior art publications and patents are. It goes into full prior art. In this case, though, in the first re-examination, the issue before the tribunal was whether or not there was a product with gel on both sides of it. They went in and affirmatively said, distinguish the prior art. Well, no, I think you're misstating what was involved in the first re-exam. I thought the first re-exam was based solely on the silo sheet. The issue with respect to the silo sheet was whether prior art had gel on one side of the fabric. No, but I'm confused. And you're going to have to show me that it was broader than the silo sheet because that was my understanding is that that was the prior art, the physical silo sheet. Sure, Your Honor. The product before the court was the silo sheet, but I don't know that the patent office is not limited to a specific product. The issue that they went and argued as we overcome prior art because we only have gel on one side of our fabric. Knowing when they went in and they made that argument, Mr. Coleman. Yes, sir, Your Honor. I want to see where they said it and exactly what they said. Yes, sir, Your Honor. In the, of course, there's no transcript of the interview. There's a summary that's written afterward and it was submitted by Mr. Gein and Mr. Gein's summary that was written after the July 17, 2007 interview. Mr. Gein specifically said that all prior art, the testimony at trial. You have to come to this argument. If you're going to argue something, you have to show us where it says it because we're not going to necessarily rely on what counsel says about it. You have to be able to show us exactly what was said because counsel's characterizations of things not always accurate. And you should come to the argument prepared to support what you're arguing.  you don't know where it is. That's the way it is. I apologize, Your Honor. I don't have that one specific citation handy, but I understand in the issue in that particular re-examination, again, was whether they overcome the prior art based on the fact that their product, their patent has gel on only one side of the fabric and they went into that proceeding. Mr. Colvin testified at trial that they went into that proceeding and didn't disclose it. Mr. Gein claims, I didn't know about that stuff. Mr. Stanley was in the room. Mr. Stanley was trial counsel. Mr. Stanley did see what was in the summary judgment motion. He was the lead trial counsel on the case. Mr. Stanley knew of the Scalise letters. He sat on there. Excuse me, Your Honor. My paralegal is much better than I am. And he handed me the citation, Your Honor. It's JA010863-75. It is Exhibit D. I'm sorry. What was the citation again? Yes, sir. It's JA- DX-73? I'm sorry, sir. Is it DX-73? It is D-73 Exhibit and the citation, Your Honor, is JA010863. It is a part of the 688 first re-examination file record. It's a record in the case. And Judge Dyke, I apologize for not having that reference handy earlier. And so particularly in this case, the issue in the first re-examination was them representing to the patent office that there was no prior artwork gel on only one side of the fabric when Mr. Stanley was sitting in the room. And his testimony at trial was that he was just there as an observer. Respectfully, Your Honors, when you go into a meeting and you have that knowledge and you're listening to your partner at your own law firm make an argument, you have a duty to disclose that information. He knew that- What's the citation of this? Which volume of the appendix? Yes, sir. It's Exhibit D-73 and the specific page number is 010863. And I believe it's- Yes, sir. 086. 3-75. 0108? 0108. 0108? Correct, 6-3. 6-3, okay, I have it here. And again, this is a summary- Where on this page? I don't have the page in front of me, Your Honor, but I believe that to be the summary of- It is. I'm sorry? It is. It's about 0865 as far as I can tell. Thank you, Your Honor. So it talks about being unpatentable over the silo-paste, silo-sheet products as disclosed in the catalog and business news pages. So it's talking about a specific product disclosed in certain particular references. And they failed to represent- What they said, Your Honor, was that there was no product with gel on both sides of the fabric. I don't see- That's not on this page. I don't see that. Your Honor, it is pervasive. That was the issue in this entire case and in both re-exams. The issue was the rejection was based on the fact that the gel had bleed-through, the bleed-through problem. In this court's prior opinion- Okay, I think we're out of time. Thank you. Thank you, Your Honor. Thank you. Your Honor, the reference in that page of the joint appendix, the counsel was just talking about, clearly talks about a nylon sheath when it's talking about the silo-sheath. And it's clear of record here. If there's one thing that's clear of record- That is the one you cited, Your Honor, 10865. And he's talking about- On that note, he cited 63. I think Judge Wallet directed him to two pages later in the specific point where I think the reference was to actual silo-sheath products distributed during that time. And he talked about the presence of the nylon sheath. And that relates also to my point about the difference between the SSGL and the rest of the silo-sheath line. The rest of the silo-sheath line has the nylon fabric which permits the bleed-through. The whole point of the contest testimony plugging the gap or explaining what one skilled in the art would get out of the comfort zone at is that it had coolmax. It had a different fabric. So in order for anything to be corroborative or material, much less but-for material in the secondary exam, it cannot deal generally with all silo-sheaths, much less the nylon silo-sheaths. It has to be corroborative on the ones that he was talking about that the examiner found created the issue. And those are just the SSGLs because the SSGLs had the coolmax. And the coolmax does not. It is much more hard for bleed-through. So it's an on-sale bar matter. Once the SSGL shows up, it's a different issue. Well, I was going to point out that in the letters themselves, in the first letter, he makes it clear that he's talking about a silo-sheath product sold as early as 1992. And nobody in any of these declarations suggests that the SSGL was on sale as early as 1992. In the second letter, where he attaches the invoice, and I need to go to our reply brief on page 23. This is the November 1993 invoice. The November one, the one that went to Traynor in 1999. 1215-5. And 1215 is clearly the nylon silo-sheath. Mr. Comtesse, this is on page 23 of our brief, stated in his deposition that the SSGL was sold under items number 1272, 1275, and 1276. And that's JA7049. That's the citation for that. The record has a reference to the product that was sent, the actual physical product that was sent along, I guess, with the first Scalise letter, identified as 1215. Is that right? It's the second letter that has the product. And that was the one that Mr. Traynor submitted in the earlier application that kept the photo. Was that, do we know whether that is the SSGL or the silo-sheath pre-SSGL? His testimony is that 1215 means the nylon silo-sheath. But we have the physical. Well, we don't have it. It is identified in the record, on those sites I was quoting, as the same number, 1215, with an extra 5, which he says just tells what year it was made. But it's a 1215. That makes it not an SSGL. That makes it a fabric silo-sheath that was the subject of the first re-exam. That's why I was trying to say earlier, and I apologize, that I did not have the letters specifically in front of me. But the letters talk about nylon, the nylon liner. That makes them not an SSGL, because the SSGL clearly has the Coolmax. Okay, Mr. Lipkin, I think we're out of time. Okay, thank you, Judge. Thanks, both counsel. The case is submitted.